[*Special Term, January,* 1870.]

## NOVA CÆSAREA HARMONY LODGE *v.* WHITE, CORBIN AND BOUVE.

Where a five years lease was granted of a room in the Masonic Temple, with a provision that the premises should not be used for any purpose whereby "the risk from fire should be made more than ordinary or common," the provision must be taken to have reference to the estimate of risks by insurers; and if the lessee assign his lease, and the assignee attempt to introduce a caloric engine, which does, by the conditions in policies of insurance, "make the risk from fire more than ordinary or common," the lessor is entitled to an injunction to restrain such assignee of the lease from such use of the premises.

STORER, J.    This was an action to restrain the defendants from running a caloric engine in the Masonic Temple.    The particular store occupied by the defendants was leased some five years since to Maybery & Co. for a term which was to expire on the 1st July, 1869, and by a lease providing against any "use of the premises involving a risk above ordinary or common."    During the fourth year of the term the possession of the premises was given up by Maybery & Co., and the defendants succeeded to the possession, either by way of a verbal transfer from Maybery & Co., of the residue of the term of that lease, or by way of a surrender of that lease to the lodge, and a verbal reletting of the same premises, for a time measured by the residue of the term under the lease, to the defendants.

It is claimed by the defendants that the lease had been surrendered by Maybery & Co. to the lodge, or at any rate, that defendants dealt directly with the lodge, and took it by direct lease from the lodge, and not by transfer from Maybery & Co., and that the effect of such reletting was equivalent to an accepted surrender by Maybery & Co. of the residue of their term to the lodge, and a reletting by the lodge to the defendants, and that such reletting was

verbal without reference to the original lease to Maybery & Co., and without any restriction whatever.

A. large number of witnesses were examined. On this point, my conclusion of fact is, that whether the lease was transferred, or there was a surrender and reletting, it was upon the *terms,* as well as for the^ *time,* prescribed by the lease. The proof, on the part of the agents and officers of the lodge, is positive on that point, and they are sustained by the circumstances and by the uniform practice of the lodge. Here was a building of very great value, owned by the lodge, occupied by many different tenants, and with policies of insurance upon the property held by the lodge, to the amount of $80,000, while much the largest share of the risk was carried by the lodge itself. It would be a singular oversight, if the agents of the lodge made a lease to any tenant with liberty to vitiate all its policies, or even to enhance its own risk, without even asking its consent.

The lease was in evidence as given to Maybery & Co. It had been recorded, so as to charge those contracting in reference to it with notice of its contents.

It is incredible that under these circumstances the officers and agents of the lodge should have limited this letting so precisely to the term prescribed by the lease, and should have left the tenant so entirely free from any of the restrictions it contained for the protection of the other property from enhancement of the risk.

I can not doubt the substantial truth of the statements of .Folger, Aten, and others, on this subject. It is to be regretted that more care was not taken to reduce the contract to writing.

It is not necessary to refer more particularly to the lease than to recite the clause which provided that no use should be made of the premises whereby the risk from fire should be made "more than ordinary or common," and against any occupancy of the premises which would render the risk "more than ordinary or common."

The fact, whether the introduction and the use of the caloric engine would render the risk more than ordinary or common, has been the subject of much testimony.

The result on my mind, produced by the weight of all the evidence, has been, that while the printing establishment operated by the caloric engine would actually enhance the risk above ordinary, it is not shown that the use of the caloric engine actually increased the risk above that which existed by reason of the hand-printing press and the stove used for warming the room.

And here the defendants say, that they had already obtained permission to put in the hand-press, and already had the stove in use; and therefore, upon the evidence, the caloric engine, which answers the double purpose of running the printing press and warming the room, superseding the stove, does not enhance the risk, and is not forbidden by the lease.

The plaintiff states, on the other hand, that the introduction of the caloric engine makes, under all their policies, an extra or specially hazardous risk, and entitles the insurer to cancel the policy, with a loss to the lodge of premiums paid and of the benefit of the policies; and that the insurers have all objected to the caloric engine, and will either cancel the policies or demand higher premiums, and that the lodge, therefore, can not consent. On all the policies but one, consent had been obtained by the lodge to allow the *hand* printing press; but that consent can not be obtained for the *caloric* engine with the printing press.

This brings us to the question, what is intended by a "risk more than ordinary or common." Is that question to be decided by the judgment of witnesses as to actual risk, or by the classification of risks in the policies of insurance? In the classification of risks adopted in nearly all the policies, this risk is more than ordinary; and I suppose, from the evidence, that I am compelled to find that by general usage among insurers such an engine in use would be more than an ordinary risk. It would fall among trades or

occupations requiring fire-heat, if not under the class of engines driven by steam power, which is usually classed as " specially hazardous." There are many trades classed as hazardous, raising the actual risk so slightly, if at all, above " ordinary," that it would be hard to vitiate a policy on that account, especially if their presence in the insured premises were known to the insurers. But a caloric engine running a printing press, from the evidence, must be regarded as more than an ordinary risk. Taking the circumstances under which the *hand* printing press was placed in the premises, with the consent given subsequent to the lease, the risk not being contemplated when the lease was made, and the fact that the policies do make this use which is proposed *specially hazardous,* it seems to me that, under the contract between these parties, it is the duty of the court to protect the landlord against the job printing press run by the caloric engine.

I think that the provision in the lease has reference to the risks as classified for insurance, and that the court must regard the ordinary and usual conditions in policies in coming to a conclusion. Undoubtedly, a condition against a particular trade or use must be complied with, even if it do not actually increase the risk. *Parker* v. *Bridgeport Ins. Co.*, 10 Gray, 306.

But, in the present case, I am also of the opinion that considering the printing press, which, under the circumstances, I can not entirely overlook, there is a slight actual increase of risk above that originally contemplated by the terms of the lease. The case is not free from difficulty. But I have adopted what appears, on the whole case, the safer as well as the legal conclusion.

The motion for provisional injunction is granted.